THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: July 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
\_\_\_\_

Trademark Trial and Appeal Board
\_\_\_\_

*Rapid Inc.*

*v.*

*Hungry Marketplace, Inc.*
\_\_\_\_

Opposition No. 91236033
\_\_\_\_

Jayson M. Lorenzo of J. Lorenzo Law for Rapid Inc.

James R. Menker of Holly & Menker PA for Hungry Marketplace, Inc.

\_\_\_\_

Before Wellington, Shaw and Lebow,
Administrative Trademark Judges.

Opinion by Lebow, Administrative Trademark Judge:

Applicant, Hungry Marketplace, Inc., seeks to register the mark HUNGRY (in

standard characters) on the Principal Register for the following goods and services:[1]

> Downloadable software in the nature of a mobile application for
> enabling users to solicit each other to perform a wide range of cooking
> and meal preparation and delivery services between users;
> Downloadable software in the nature of a mobile application for

---

[1] Application Serial No. 87024660 (the "HUNGRY Application") was filed on May 4, 2016, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intent to use the mark in commerce.

engaging others to prepare meals via text messages, SMS messages, telephone calls, in-app messages, emails and push notifications; Mobile application software for enabling chefs to sell prepared meals for users; Downloadable software in the nature of a mobile application for enabling chefs to list and market to diners meals for sale and schedule day and time of meal delivery; Downloadable software in the nature of a mobile application for connecting chefs and home diners via text messages, SMS messages, telephone calls, in-app messages, emails and push notifications; Downloadable software in the nature of a mobile application for automated ordering and delivery of home cooked meals between users; Downloadable software in the nature of a mobile application for allowing users to list and order home cooked meals and other foodstuffs between users; Downloadable software in the nature of a mobile application for providing evaluative feedback and ratings of the cooking of other users, the value and prices of prepared meals, chef's performance, and overall experience in connection with home cooked meals prepared by chefs (International Class 9); and

Providing temporary use of on-line non-downloadable software and applications for enabling users to solicit each other to perform a wide range of cooking and meal preparation and delivery services between users; Providing temporary use of on-line non-downloadable software and applications for connecting chefs and home diners via electronic messages, SMS messages, text messages, telephone calls and email; Providing temporary use of on-line non-downloadable software and applications for automated ordering and delivery of home cooked meals between users; Providing temporary use of on-line non-downloadable software and applications for allowing users to list and order home cooked meals and other foodstuffs; Providing temporary use of on-line non-downloadable software and applications for engaging others to prepare meals via electronic messages, SMS messages, text messages, telephone calls and emails; Providing temporary use of on-line non-downloadable software and applications for enabling chefs to sell prepared meals for users; Providing temporary use of on-line non-downloadable software and applications for providing evaluative feedback and ratings of the cooking of other users, the value and prices of prepared meals, chef's performance, and overall experience in connection with home cooked meals prepared by chefs; Providing temporary use of on-line non-downloadable software and applications for enabling chefs to list and market to diners meals for sale and schedule day and time of meal delivery (International Class 42).

Opposer, Rapid Inc., opposed registration on the ground that the mark HUNGRY,

when used in connection with the goods and services identified in the HUNGRY Application, is likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), with Opposer's previously used mark HUNGR for:

> Computer software for ordering and managing food orders and for coordinating same-day transportation and delivery services in the nature of courier services and same day pick-up and delivery of goods in local areas; computer software for providing information on available same-day transportation and delivery services in the nature of courier services; and

> Providing temporary use of on-line non-downloadable software for ordering and managing food orders, for coordinating same-day transportation and delivery services in the nature of courier services and same day pick-up and delivery of goods in local areas; Providing temporary use of on-line non-downloadable computer software for providing information on available same-day transportation and delivery services in the nature of courier services.[2]

Opposer pleaded ownership of Application Serial No. 87070189 ("the '189 Application"), filed on June 14, 2016, to register the mark HUNGR, in standard characters, for the same goods and services noted above in International Classes 9 and 42, respectively.[3] Opposer asserts that the examining attorney assigned to the '189 Application "indicated that a prior-pending application, namely [the HUNGRY Application] may present a bar to registration of [Opposer's] mark under Section 2(d) of the Trademark Act," and suspended the '189 Application "until [the earlier-filed HUNGRY Application] is either registered or abandoned."[4]

---

[2] 15 TTABVUE 11-13 (Amended Notice of Opposition, ¶¶ 1-2, 6-7).

Citations in this opinion to the briefs, the record, and other filings in the case refer to TTABVUE, the Board's online docketing system. *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[3] *Id.* at 12 (¶ 2).

[4] *Id.* (¶¶ 4-5). Opposer also "alleges in the alternative that – if the TTAB finds that Opposer's

Applicant, in its answer, admitted that "the US PTO records show that Application Serial No. 87070189 for the mark HUNGR was filed on June 14, 2016 by Opposer"; that Applicant's HUNGRY mark in the opposed application was cited by the examining attorney as a potential refusal based on likelihood of confusion; and that Opposer's application was suspended "until [the opposed application] is either registered or abandoned."[5]

Both parties filed briefs.

## I.   The Record

The record includes the pleadings, the file of the HUNGRY Application by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), and additional evidence made of record by the parties:

Opposer introduced the testimony declaration of Aaron Mortensen, Opposer's Vice President and Chief Information Officer;[6] the testimony declarations of Ahmed

---

mark is merely descriptive under Section 2(e)(1) [15 U.S.C. § 1052(e)] of the Trademark Act as of Applicant's filing date, and therefore that Opposer lacks priority – then the applied for mark HUNGRY is merely descriptive of Applicant's goods and services." However, Applicant does not contend that Opposer's mark is merely descriptive (or lacks distinctiveness), nor does the examining attorney who suspended Opposer's mark in Opposer's HUNGR Application. We therefore dismiss Opposer's conditioned alternative claim as a nullity. *See, e.g., Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009) ("Respondent has not raised an issue as to the distinctiveness of petitioner's mark or otherwise put petitioner on notice of this defense, and therefore we find that the mark is distinctive.") (citing *Wet Seal Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1634 (TTAB 2007) (absent argument or evidence from applicant, opposer's mark deemed distinctive)); *Chicago Corp. v. N. Am. Chicago Corp.*, 20 USPQ2d 1715, 1717 n.5 (TTAB 1991) (rejecting applicant's argument that opposer failed to prove that its mark was distinctive where applicant failed to plead the issue or introduce evidence of non-distinctiveness).

[5] 18 TTABVUE 3 (Applicant's Amended Answer, ¶¶ 3-5).

[6] 24 TTABVUE ("Mortensen Decl." and public exhibits, including exhibit 8A, which has portions redacted); 23 TTABVUE (confidential exhibits 7 and 9-12 from the Mortensen Decl.).

Ihmud and David Lucchetti, both independent contractors who "mak[e] pick-ups from restaurants and deliveries to [Opposer's] HUNGR customers";[7] the testimony declaration of Fardad Raouf, a restaurant owner whose restaurant is "listed on [Opposer's] HUNGR mobile app";[8] and the testimony declaration of Rosalie Delaney, a customer who downloaded Opposer's HUNGR mobile app and used it to place a restaurant order.[9] Opposer also filed a notice of reliance on Applicant's response to Opposer's interrogatory No. 9, as well as printouts from the USPTO's Trademark Status & Document Retrieval ("TSDR") database of the file history for Opposer's HUNGR Application.[10]

Applicant introduced the cross-examination testimony depositions of Opposer's witnesses listed above,[11] as well as the testimony declarations of its own witnesses including Jeff Grass, Opposer's Chairman and Chief Executive Officer;[12] Chris Butler, the Office Manager at the Internet Archive;[13] Troy Brackett, owner of the website restaurantnews.com;[14] and Jonathan Taylor, an employee of Opposer.[15]

---

[7] 22 TTABVUE 4-5 ("Ihmud Decl."), 8-10 ("Lucchetti Decl." and attached exhibit).

[8] *Id*. at 13 -16 ("Raouf Decl." and attached exhibits).

[9] *Id*. at 19-20 ("Delaney Decl.").

[10] 21 TTABVUE 6-9 (interrogatory response), 11-60 (file history).

[11] 59 TTABVUE 6-49 ("Ihmud Cross Dep."), 51-90 ("Raouf Cross Test."), 92-133 ("Delaney Cross Dep.), 135-76 ("Lucchetti Cross Dep."), 178-303 ("Mortensen Cross Dep."). Immediately following TTABVUE citations to this testimony are parentheticals indicating the specific page(s) and line(s) in the relevant deposition transcript.

[12] 60 TTABVUE 2-9 ("Grass Decl."), 10-118 (exhibits).

[13] 61 TTABVUE 4-6 ("Butler Decl."), 7-19 (exhibits).

[14] 62 TTABVUE 4-6 ("Brackett Decl."), 7-70 (exhibits).

[15] 67 TTABVUE 4-9 ("Taylor Decl."), 10-74 (exhibits).

Applicant also filed notices of reliance on printouts from various third-party websites, including an article from restaurantnews.com;[16] search results from California Secretary of State's business database;[17] WHOIS records for Opposer's myhungr.com domain name;[18] pages from Opposer's social media pages and those of third-party entities purportedly related to Opposer, as well as those of Opposer's witnesses Mr. Mortensen and Mr. Lucchetti, and also Rebekah Mortenson, Mr. Mortensen's wife and CEO of Opposer;[19] pages from the website of the San Diego Superior Court pertaining to a lawsuit "in which the Mortensen were parties….";[20] TSDR printouts of other applications owned by Opposer;[21] TSDR printouts of various third-party applications and registrations;[22] printouts from the websites of several third-parties companies that use the term "hungry";[23] and printouts from the Google Play app store and a third-party website.[24]

## II.   Opposer's Motions to Strike

In its trial brief, Opposer renewed its previously filed motions to strike all or portions of what it argues is the "undisclosed expert testimony" of Applicant's

---

[16] 63 TTABVUE 7-9 (Opposer's First Notice of Reliance, Exhibit 1).

[17] *Id.* at 10-85 (Exhibits 2-9).

[18] *Id.* at 88-91 (Exhibit 11).

[19] *Id.* at 86-87 (Exhibit 10), 92 (Exhibits 12); 64 TTABVUE (Exhibits 13-15); 65 TTABVUE 49-57 (Exhibits 16-20).

[20] 65 TTABVUE 37-48 (Exhibit 25).

[21] 66 TTABVUE 5-298 (Applicant's Second Notice of Reliance, Exhibits A-C, D-1 and D-2).

[22] 68 TTABVUE 7-50 (Applicant's Third Notice of Reliance, Exhibits 1-11).

[23] *Id.* at 51-65 (Exhibits 12-15).

[24] *Id.* at 66-12- (Exhibit 16-30).

witnesses Jonathan Taylor (a "Full Stack & Mobile Developer" employed by Applicant) and Jeff Grass (Opposer's Chairman and CEO).[25] The Board deferred ruling on the motions until final decision.[26] We rule on them now.

In its motions to strike, Opposer asserts that although "Applicant's expert disclosures were due on February 4, 2019," "no expert disclosures were ever served on Opposer's counsel."[27] Opposer contends that "Mr. Taylor's entire declaration is argument and purported expert opinion regarding the declaration of [Opposer's witness,] Mr. Mortensen," and "not on the basis of personal knowledge of or on-the-scene involvement in any sequence of events that gave rise to the instant Board proceeding."[28] With respect to Mr. Grass, Opposer asserts that apart from "9 [paragraphs in his declaration that] directly relate to Applicant's business and use of the mark," "[a]ll other paragraphs are Mr. Grass opining directly on either legal conclusions or qualifying technical data of which he is not an expert, has not been disclosed as an expert, and is not qualified to opine under guidance of Federal Rules of Evidence 701 and 702."[29]

Applicant does not dispute that no expert disclosures were served on Opposer, but

---

[25] 82 TTABVUE 33-34 (Opposer's Brief); 76 TTABVUE (Opposer's Motion to Strike Grass Decl.); 80 TTABVUE (Opposer's Motion to Strike Taylor Decl.).

[26] 81 TTABVUE 1-2 (Board Order of September 27, 2021).

[27] 71 TTABVUE 3, 72 TTABVUE 2 (Motions to Strike). Trademark Rule 2.120(a)(2)(iii), 37 C.F.R. § 2.120(a)(2)(iii) provides for disclosure of expert testimony in the manner and sequence provided in Fed. R. Civ. P. 26(a)(2), unless alternative directions have been provided by the Board.

[28] 71 TTABVUE 5 (Motion to Strike Taylor Decl.).

[29] 72 TTABVUE 5 (Motion to Strike Grass Decl.).

denies that the witnesses are "untimely-disclosed expert witnesses."[30] With respect

to Mr. Taylor, Applicant argues that:

> Opposer now seeks to elevate Mr. Taylor to the level of an untimely-disclosed expert witness despite the fact that Mr. Taylor is merely offering facts that are no different from the facts offered by Mr. Mortensen in his declaration. One need not be an expert witness to provide facts based on his own experience and contemporaneous review of various documents, especially when those facts are based on one's own review of publicly-available documents (such as documents from the Apple App Store and Google Play Store). Nor does Mr. Taylor have to ever been employed by or involved with Opposer to state when he believes Mr. Mortensen's statements about various documents are incorrect and/or misleading.[31]

With respect to Mr. Grass, Applicant argues that:

> Opposer now seeks to seize on two of the general subjects attributed to Mr. Grass [in Opposer's pretrial disclosures] to elevate him to the status of an untimely-disclosed expert witness whose testimony should now be stricken. There are numerous problems with this novel analysis.
>
> First, simply because Applicant may have used language in its "general summary or list of subjects" for Mr. Grass that might also apply to the testimony of an expert does not automatically make Mr. Grass an expert. … Importantly, nowhere in its Motion does Opposer state that it was "surprised" to receive the information in Mr. Grass's declaration, which is one of the purposes of Rule 26 in the first place.
>
> Second, testimony about the "relative weakness of Opposer's HUNGR mark" does not require the opinion of an expert. …
>
> Third, even if one could deliberately misinterpret the generalized language in a party's Rule 26 disclosures as Opposer suggests, and even if the relative weakness of a party's mark required the testimony of an expert as Opposer also suggests, there is no evidence or argument that Mr. Grass intended to or did introduce such testimony in his declaration.[32]

---

[30] 76 TTABVUE 4, 80 TTABVUE 4 (Applicant's Oppositions to Opposer's Motions to Strike).

[31] 80 TTABVUE 4 (Applicant's Opposition to Opposer's Motion to Strike Taylor Decl.).

[32] 76 TTABVUE 4-5 (Applicant's Opposition to Opposer's Motion to Strike Grass Decl.).

Because Applicant concedes that Messrs. Taylor and Grass are not expert witnesses, we must determine whether their objected-to testimony is proper. Rule 701 of the Federal Rules of Evidence provides that lay opinion testimony is permitted only if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) **not based on scientific, technical, or other specialized knowledge within the scope of Rule 702**" (emphasis added). *Cf.* Fed. R. Evid. Rule 701 ("witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . .").

However, the advisory committee notes accompanying the amendment that added Rule 701(c) made clear that "particularized knowledge that the witness has by virtue of his or her position in the business" is not "scientific, technical, or other specialized knowledge," even if it involves knowledge that the average person would have to consult an expert about, like the "value or projected profits of a business" or that a substance "appeared to be a narcotic." Fed. R. Evid. 701, advisory committee's note to 2000 amendment." *See also Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 57 USPQ2d 1293, 1298 (Fed. Cir. 2001) (applying Fifth Circuit law and allowing lay opinion testimony regarding patent enablement based upon witnesses' own personal experience in oil drilling industry); c*f. Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1484 (TTAB 2017) (allowing and considering certain lay opinion testimony based upon the experience and knowledge acquired by the witness as an engineer, familiarity with plaintiff's goods, the marketplace in which they

compete, and their manner of use, but declining to consider other testimony that "le[ft] the realm of informed lay opinion.").

We have carefully reviewed the declaration testimony of Messrs. Taylor and Grass and find that, for the most part, their testimony is rationally based on their perceptions, helpful to our understanding of their testimony and other facts at issue, and not based on scientific, technical, or other specialized knowledge, but rather, on the particularized knowledge the witnesses have through experience in their respective fields and working with Opposer. To the extent that their respective testimony departs from "the realm of informed lay opinion," and is relevant to the facts at issue, we will point it out and note that it cannot be relied on in the manner sought. *See Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *11-12 (TTAB 2020) ("Because a cancellation proceeding is akin to a bench trial, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such testimony and evidence."); *Hunt Control Sys. Inc. v. Koninklijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011). Therefore, while we keep Opposer's objections in mind as we review the evidence in this case, we need not strike the testimony of these witnesses.

## III.    Entitlement to a Statutory Cause of Action

An opposer's entitlement to invoke a statutory cause of action to oppose the registration of a mark is a necessary element in every opposition proceeding. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir.

2020), *cert. denied*, 141 S. Ct. 2671, 210 L. Ed. 2d 833 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82, 211 L. Ed. 2d 16 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392, 109 USPQ2d 2061, 2067 n.4 (2014)). An opposer may seek to oppose the registration of a mark if its claim falls within the zone of interests protected by Section 13 of the Lanham Act, 15 U.S.C. § 1063, and the opposer has a reasonable belief in damage that is proximately caused by registration of such mark. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *1 (TTAB 2020)).

As noted above, Applicant admitted in its answer to the notice of opposition that Opposer's pleaded application to register the mark HUNGR was suspended pending disposition of the subject application, which was cited as a potential bar.[33] Opposer also introduced printouts of the file history for its suspended application from the USPTO's TSDR database, including a copy of the suspension notice that issued.[34] This is sufficient to establish Opposer's entitlement to bring this opposition. *See Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1039-40 (TTAB 2018) (opposer's entitlement established through applicant's concessions and admissions that opposer's pending application would be refused registration should applicant's application register); *Saddlesprings Inc. v Mad Croc Brands Inc.*, 104

---

[33] 18 TTABVUE 3 (Applicant's Amended Answer, ¶¶ 3-5).

[34] 21 TTABVUE 10-60 (Opposer's Notice of Reliance, Exhibit 2).

USPQ2d 1948, 1950 (TTAB 2012) (same); *Weatherford/Lamb Inc. v. C&J Energy Servs. Inc.*, 96 USPQ2d 1834, 1837 (TTAB 2010) (Office action suspending plaintiff's pending application pending possible refusal based on alleged likelihood of confusion with defendant's registration made of record).

## IV.  Priority

Section 2(d) of the Trademark Act permits opposition based on ownership of "a mark or trade name previously used in the United States . . . and not abandoned." "[T]he decision as to priority is made in accordance with the preponderance of the evidence." *DeVivo v. Ortiz*, 2020 USPQ2d 10153, \*3 (TTAB 2020) (quoting *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987); *see also Embarcadero Techs., Inc. v. RStudio, Inc.*, 105 USPQ2d 1825, 1834 (TTAB 2013). ("[O]pposer must prove by a preponderance of the evidence that its common law rights were acquired before any date upon which applicant may rely."). In this case, Opposer's allegation of priority, and evidence submitted in support thereof, is heavily contested by Applicant.

Applicant, for its part, asserts that it "established that it began using its HUNGRY mark publicly on December 15, 2015," pointing to the testimony of Jeff Grass, its Chairman and CEO,[35] who testified in his declaration that (i) Applicant's website, which featured its HUNGRY mark, went live on that date and invited visitors to "[c]hoose from over 2,500 home-cooked meals served by 200+ local chefs in the DC Metropolitan area"; and (ii) its Facebook and Twitter profiles were also

---

[35] 83 TTABVUE 14 (Applicant's Brief).

created on that date.[36] To be considered "use in commerce," however, Applicant's services must have actually been rendered. *See* 15 U.S.C. § 1127 (definition of "use in commerce"); *see also Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 90 USPQ2d 1301, 1305 (Fed. Cir. 2009). Here, the record is silent as to Applicant's actual use.

Nevertheless, Applicant may rely on the May 4, 2016 filing date of the HUNGRY Application as its constructive date of first use. *See e.g., Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009) ("[A]pplicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority"); *Levi Strauss & Co. v. R. Josephs Sportswear, Inc.*, 36 USPQ2d 1328, 1332 (TTAB 1994) (an application filing date for a use-based application can establish first use of a mark); Trademark Act Section 7(c), 15 U.S.C. § 1057(c).

Opposer, on the other hand, asserts that it "has used its mark HUNGR in commerce in connection with the downloadable software and on-line downloadable software that allows users to order and arrange for the delivery of meals" "since 2012."[37] As support for this contention, Opposer relies on the testimony of its Vice President and CIO, Aaron Mortensen, the evidence introduced as exhibits to his testimony declaration, and the purported corroboration provided by several other witnesses, which we discuss below.

It is Opposer's burden to prove by a preponderance of the evidence that it acquired its common law rights before Applicant's May 4, 2016 constructive use priority date.

---

[36] 60 TTABVUE 5 (Grass Decl., ¶¶ 5-6), 10-19 (Exhibits).

[37] 82 TTABVUE 23 (Opposer's Brief).

*See Hydro-Dynamics*, 1 USPQ2d at 1773. "[O]ne should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use." *W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994), quoted in *Daniel J. Quirk, Inc. v. Vill. Car Co.*, 120 USPQ2d 1146, 1150 (TTAB 2016).

### A. Testimony of Aaron Mortensen

According to Mr. Mortensen, "[w]e have operated a meal ordering and delivery service under the name HUNGR since 2012" and that "[o]riginally, the HUNGR business was created under a company called CENTIX Systems, a California corporation," which "merged into a new company called Orbit Brewing, Inc. d/b/a Fluid 5, also a California corporation," which "merged into [Opposer] when [it] was incorporated in California in November 2014."[38] Opposer thus seeks to rely on prior use of the mark HUNGR purportedly made by its predecessor companies.[39] In any event, Opposer may rely on its own use of the mark to the extent it precedes Applicant's constructive priority date of May 4, 2016.

We turn now to the specific actions Opposer relies on, via the testimony of Mr. Mortensen and other witnesses, to establish its priority.

---

[38] 24 TTABVUE 5 (Mortensen Decl., ¶ 3).

[39] Applicant, during its testimony period, introduced evidence consisting of printouts from the California Secretary of State's business search database showing the absence of any listing of the three companies noted above, including Opposer, 63 TTABVUE 10-85 (Applicant's First Notice of Reliance, Exhibits 2-9). However, Applicant did not mention this evidence in its brief.

### 1. Opposer's Downloadable Meal Ordering and Delivery Software and Web-based Ordering Interface.

Although "the core services or goods" provided by Centix, the company under which Opposer's asserted "HUNGR business was created," was "hospitality management software,"[40] Mr. Mortensen testified that Centix "made the original software and logistics program for the HUNGR program," and that he "built the software and websites and still ha[s] an active role in their maintenance."[41] He further testified that "we have used the mark HUNGR as the name of our meal ordering and delivery software since 2012 when the HUNGR software program was first made available on the Internet by way of web-based ordering interface and also by way of downloaded, locally-operated software run on personal computers."[42] According to Mr. Mortensen, "[t]he mark HUNGR has continuously appeared prominently at the top of our website home page since our first website went live in 2012."[43]

To corroborate this testimony, Mr. Mortensen provided a screenshot of what he claims was the "first version of the HUNGR website." We reproduce it below, along with enlarged excerpts of the URL and date/time shown at the bottom on the page:[44]

---

[40] 59 TTABVUE 215 (Mortensen Cross Dep., p. 38:11-17).

[41] 24 TTABVUE 5 (Mortensen Decl., ¶ 3).

[42] *Id.* at 7 (¶ 6).

[43] *Id.*

[44] *Id.* at 18 (Exhibit 1).



(enlarged excerpts of screenshot)

http://centixsys.com/client_design/hungr_web_ordering.html

2012-01-01 11:59PM

As Applicant notes, the above screenshot "is the only evidence Opposer proffers to substantiate [its] claim of use since 2012," and Opposer does not "offer any other contemporary evidence that would corroborate that this website was available to the public; promoted by Opposer; ever used by the public to download software (assuming this was even possible); or actually used by the public to order meals. Indeed, there is no contemporary evidence that would corroborate that Opposer was rendering or even could render any services through the website."[45] "Opposer also provides no information about its alleged downloadable software or any screenshots of any other web pages related to this web page, much less any later dated screenshots of this web page."[46]

---

[45] 83 TTABVUE 23-24 (Applicant's Brief).

[46] *Id.*

Applicant also provided the testimony of Chris Butler, the Office Manager at the Internet Archive,[47] who testified that:

> A web browser may be set such that a printout from it will display the URL of a web page in the printout's footer. The date indicated by an extended URL applies to a preserved instance of a file for a given URL, but not necessarily to any other files linked therein. Thus, in the case of a page constituted by a primary HTML file and other separate files (e.g., files with images, audio, multimedia, design elements, or other embedded content) linked within that primary HTML file, the primary HTML file and the other files will each have their own respective extended URLs and may not have been archived on the same dates.[48]

Based on the foregoing, Applicant concludes that "[i]n light of Opposer's history of doctoring documents, it is not even clear that the URL and time and date stamp are not typed as part of the screen shot or are an actual date and time stamp."[49] Applicant's reference to Opposer's purported history of doctoring documents relates to other evidence presented by Opposer in this case, which we will discuss later in this opinion.

While the use of "/client_design/" in the purported URL seems to suggest that it is a template for the page, we cannot conclude, definitively, that it is. Furthermore, in the absence of evidence related to promotion of that URL, or one that resolves to it, it is unclear how consumers would find the site without first knowing that the mark existed, or why they would be inclined to enter a zip code into the space provided. In any event, there is no direct evidence proving that the screenshot in question has

---

[47] 61 TTABVUE 1 (Butler Decl., ¶ 2).

[48] *Id*. at 5 (¶ 6).

[49] 83 TTABVUE 24 (Applicant's Brief).

been "doctored." Suffice to say that it has minimal, if any, probative value with respect to showing Opposer's use of the mark HUNGR in connection with any particular goods or services as of 2012. While the screenshot displays the mark HUNGR and shows a table set with food and wine in the background, it does not advertise any goods or services; it simply invites potential users to enter a zip code, which does not suffice to show use of the mark in connection with any goods or services.

Mr. Mortensen's testimony that Opposer "used the mark HUNGR as the name of [its] meal ordering and delivery software since 2012 … by way of downloaded, locally-operated software run on personal computers"[50] also has minimal probative value in the absence of any corroborating evidence pertaining to that software, its availability to consumers, and whether it was actually used by any such consumers. Mr. Mortensen asserted that "[d]ue to changes in our computer systems over the years, we are unable to provide some of the early data for the HUNGR program."[51] Opposer provided no data whatsoever for its downloadable software that was purportedly available during that time period.

### 2. 2012 Promotional Flyer

Mr. Mortensen testified that "[t]he mark HUNGR also has appeared prominently on promotional materials for our HUNGR software since 2012. For example, Exhibit 2 is a flyer that we distributed in 2012 to promote our HUNGR software to potential

---

[50] 24 TTABVUE 7 (Mortensen Decl., ¶ 6).

[51] *Id.* at 5 (¶ 2).

restaurant partners."[52] An excerpt of the flyer is shown below:



The flyer, however, has two components that appear questionable within the context of Mr. Mortensen's testimony. First, as shown at the top of the page, the mark is displayed as "hungr by RAPID," but according to Mr. Mortensen's own testimony, Rapid (Opposer) was not formed until November 2014,[53] and there is no evidence of record indicating that Rapid was used as a trade name prior to Opposer's formation. Second, as observed by Applicant's CEO, Jeff Grass,[54] and shown in the evidence he provided, the particular Apple iPhone depicted in the photo of the flyer appears not

---

[52] *Id.* at 7 (¶ 7).

[53] 24 TTABVUE 5 (Mortensen Decl., ¶ 3).

[54] 60 TTABVUE 8-9 (Grass Decl., ¶ 20).

to have existed until at least September 19, 2014.[55] Mr. Grass provided Wikipedia entries "for all iPhone models released by Apple between 2011 and 2017."[56] Each details the features added for each version, and presents an image of each, as shown in the below excerpts from those pages:



---

[55] 83 TTABVUE 24 (Applicant's Brief).

[56] 60 TTABVUE 84-94 (Grass Decl., Exhibit L).









As depicted in these excerpts, the iPhone 6, which the associated article indicates

was not released until September 19, 2014,[57] appears to be the first iPhone version to have a small sensor above the horizontal speaker hole at the top of the phone,[58] a larger lens to the left of it, elongated buttons on the left and right sides of the phone, and a subdued button at the bottom of the front of the phone, like the version shown in Opposer's flyer. In contrast, as shown in the photos, the first generation iPhone, the 3G, 3GS, and 4 versions do not appear to have a hole above or to the left of the speaker; the iPhone 4S appears to have horizontal hole above the speaker, as well as a small hole to the left of it; the iPhone 5 and 5S appear to have no holes to the left of the speaker; and all versions previous to iPhone 6 and 6S (which the article indicates was not released until September 25, 2015)[59] appear to have shorter or circular buttons on the left side.

Although the content of the Wikipedia pages showing the various iPhone versions discussed above is hearsay and cannot be taken for the truth of the matters therein, the pages for the iPhone first generation, 3G, 3GS, 4, and 4S versions show, on their face, iPhones that do not appear the same as the one depicted in Opposer's flyer. In contrast, the pages for the iPhone 6 and 6S show, on their face, iPhones that appear more similar to the one depicted in Opposer's flyer. Together, they contradict and are inconsistent with Mr. Mortensen's contention that the flyer he provided was distributed in 2012 to potential restaurant partners to promote the HUNGR software.

---

[57] The release date is shown in the excerpt above, as well as the article content. *See* 60 TTABVUE 93.

[58] The smaller hole on top is difficult to see due to the quality of webpage image, but can be seen when it is enlarged.

[59] 60 TTABVUE 94 (Grass Decl., Exhibit L).

We note further that although Opposer filed a reply brief, Opposer did not dispute Applicant's contention, based on the content of the article, that "[t]his likely explains why there is no evidence that any restaurants ever received a copy of this 'flyer' in 2012 (or any other time)."[60]

### 3. Purported Use of the mark HUNGR on Software, Including Phone Apps

Mr. Mortensen testified that "our mark HUNGR has been displayed prominently on the screen every time a user accesses our HUNGR software from 2012 to date, and our HUNGR app from January 2015 to date."[61] In support of these contentions, he provided what he purports are "two screenshots of the HUNGR trademark as it appeared on smartphone apps during 2015."[62] We reproduce them below:



Mr. Mortensen also provided what he purports are "a screenshot taken on an iPhone, showing the HUNGR icon as it appears on the screen of the iPhone," and a

---

[60] 83 TTABVUE 24 (Applicant's Brief).

[61] 24 TTABVUE 12 (Mortensen Decl., ¶ 24).

[62] 24 TTABVUE 12 (Mortensen Decl., ¶ 24), 164-66 (Exhibit 17).

"log-in page that appears after a user clicks on the icon," which he testified "were taken on December 12, 2017."[63] They are also reproduced below:



With respect to the first set of images shown above, which Mr. Mortensen asserts show the mark "as it appeared on smartphone apps during 2015,"[64] Applicant observes that "Mr. Mortensen does not actually claim that these screenshots were taken in 2015."[65] Opposer, in reply, asserts that "Mortensen's language ... clearly communicates the screenshots were indeed taken in 2015."[66] We disagree that those screenshots, themselves, communicate anything about the date on which they were

---

[63] 24 TTABVUE 12 (Mortensen Decl., ¶ 24), 167-70 (Exhibits 17 and 18).

[64] 24 TTABVUE 12 (Mortensen Decl., ¶ 24), 164-66 (Exhibit 17).

[65] 83 TTABVUE 25 (Applicant's Brief).

[66] 84 TTABVUE 21 (Opposer's Reply Brief).

taken. Mr. Mortensen does not claim they were taken in 2015. On the other hand, he specifically indicated that the second set of screenshots were taken on December 12, 2017.

### 4. Opposer's Google Play and Apple App Store Applications and Installations

Mr. Mortensen provided a copy of what he refers to as a "document from Google Play reporting the installations of a version of Rapid's HUNGR mobile app for the Android system, for the years 2015 and 2016 in the entire USA" on which "[t]he HUNGR logo appears on each page of this document."[67] According to his explanation, the document "shows … that 15 users installed the app in January 2015."[68] An excerpt from this document is shown below:



---

[67] 24 TTABVUE 8 (Mortensen Decl., ¶ 11), 23 (Exhibit 3).

[68] *Id.* at 8.

[Image continued below]



Mr. Mortensen also provided a document he asserts "comprises the Apple App Store version history of the HUNGR app at its original public release date in 155 countries including the entire USA" showing that "Version 1.0 was 'ready for sale' on October 15, 2015[;] Version 1.2 was 'ready for sale' on May 25, 2016[; and] Version 1.3 was 'ready for sale' on August 1, 2017."[69]

Based on the foregoing, Opposer asserts that "the Apple and Google Play records prove Opposer was using the HUNGR mark on its app online in 2015."[70]

In response to Mr. Mortensen's testimony, Jonathan Taylor (Applicant's Full Stack & Mobile Developer) testified that he has "extensive experience listing and editing mobile apps available on the Apple App Store and Google Play Store" and that he has performed those tasks "on behalf of Applicant."[71] He further testified that "[i]n [his] experience, the account pages from which these screenshots were taken are

---

[69] *Id.* at 8 (¶ 12)), 25-31 (Exhibit 4).

[70] 84 TTABVUE 15 (Opposer's Brief).

[71] 67 TTABVUE 4 (Taylor Decl., ¶¶ 1, 3).

populated with the app name and icon available at the time that the records are accessed by the user. Records such as these do not show the history of an app name or the icons used with an app."[72]

Noting that January 2017 appears in the content of the document Mr. Mortensen provided, Mr. Taylor contends that the screenshot could not have been taken before that time.[73] Additionally, "[t]o demonstrate that the app name and app icon appearing on the Google Play Console Dashboard page only reflects [sic] the current app name and app icon," Mr. Taylor testified that he "changed the app name and app icon for a mobile application created by Applicant that is available on the Google Play store," and he provided a printout of a page from the Google Play reflecting that change.[74] That printout indicates that one can change an app's name or icon on the Google Play store without doing a full update. "Thus," he asserts, "Opposer could easily have changed the name and icon for its app at any point without having to do a full app update."[75]

Mr. Taylor testified that the Apple App Store "version history page" similarly "only shows the current app name and the current app icon at the time the page is viewed. Anytime the app name and/or app icon is changed, the version history page will only show the current app name and app icon. Therefore, the version history page for the mobile app named "HUNGR – Food Delivery at Work" on or after August 1,

---

[72] *Id.* at 4-5 (¶ 6).

[73] *Id.* at 5 (¶ 7).

[74] *Id.* at 5-6 (¶ 9), 13-22 (Exhibit BB).

[75] *Id.* at 6 (¶ 9).

2017 does not show the app name or app icon prior to that date."[76] To support this contention, he provided "copies of screenshots taken from a 'how to page' for the Apple App Store page showing the procedure for changing the name and icon for an app" which, like the Google Play Store, indicate that the app name and icon can be changed without updating the current version of the app.[77] An excerpt from that screenshot is reproduced below:



### 5. November 30, 2015 Press Release

Mr. Mortensen provided a copy of a press release that he testified was "distributed by [Opposer] and dated November 30, 2015, announcing the availability of an updated version of the HUNGR app."[78] He also provided "an article published by Restaurantnews.com" on the same date, titled "RAPID Launches ToGo Mobile Delivery," that he testified "is based on the press release" and "accurately describes the updated version of the HUNGR app."[79] An excerpt of the article is reproduced

---

[76] *Id.* at 7 (¶ 13).23-24.

[77] *Id.* at 23-24 (Exhibit CC).

[78] 24 TTABVUE 8 (Mortensen Decl., ¶ 13), 32-34 (Exhibit 5).

[79] *Id.* at 9 (¶ 14), 35-39 (Exhibit 6).

below (highlighting added):



[Image Continued on Next Page]

Mr. Mortensen also provided a copy of this article as an exhibit to his declaration submitted with Opposer's reply brief in in support of its motion for summary judgment filed earlier in this proceeding, stating: "I don't know why [Applicant's witness] Mr. Grass did not find this document in his investigation."[80]

However, Mr. Grass, in a declaration that Applicant submitted with its subsequently filed motion to strike the above exhibit as evidence in Opposer's motion for summary judgment, and again during trial, presented what Applicant asserts is an "earlier version"[81] of the article that is identical to the one presented by Mr. Mortensen but for the fact that it includes no reference to the term HUNGR, and instead refers to the app as "ToGo."[82] Further, it references ToGo as a "launch," and

---

[80] 10 TTABVUE 3 (¶ 2), 10-13 (Mr. Mortensen's Declaration filed with Opposer's Reply in Support of Opposer's Motion for Summary Judgment, Exhibit 10).

[81] 83 TTABVUE 17 (Applicant's Brief).

[82] 12 TTABVUE 7-11 (Applicant's Motion to Strike, Exhibit A); 62 TTABVUE 68-70 (Brackett Decl., Exhibit D). It is important to note that the article is not of record because Applicant submitted it earlier in the proceeding, but because Applicant made it of record during its testimony period. We discuss the pretrial arguments related to that article here because, as discussed herein, the sequence of events is significant.

not as an update of an existing version. We reproduce an excerpt of the article made

of record by Applicant during its testimony period:[83]



---

[83] 62 TTABVUE 68-70 (Brackett Decl., Exhibit D).

> *which helps increase sales and overall reach to customers who may otherwise not have purchased.”*
> *Vince DeNatalie, Branding Manager*
>
> The Delivery drivers come from the RAPID on-demand platform and are background checked and reviewed with each trip to ensure that the highest level of service is provided. Each delivery driver uses insulated food carriers to help keep food at the best temperature possible.
>
> Restaurants pay a small monthly fee of just $30 to be connected to ToGo and then a small percentage from the food orders received. 24/7 support will be available to both users and restaurants. By using ToGo restaurants increase their sales and reach a larger customer base.
>
> Restaurants that want to sign-up and take advantage of the discounts being offered currently can do so at: http://join.togoapp.com
>
> ToGo will be available for both iOS and Android devices.
>
> RAPID Inc. is an on-demand technology platform based in sunny San Diego, California. Offering unique features and no-surge pricing make using RAPID the preferred choice.
>
> If you would like more information about ToGo or the RAPID platform, please contact Aaron

Notably, Opposer had filed an application to register the mark TOGO (Serial No. 86821460, "the '460 Application") for "Software for ordering and coordinating transportation services in the nature of deliveries, namely, software for the automated scheduling and dispatch of motorized vehicles for the delivery of goods from a restaurant or store" on November 16, 2015, just two weeks before the date of the article.[84] When the '460 Application was refused based on likelihood of confusion with the mark TWOGO in a prior registration for allegedly similar services, Opposer, a pro se applicant represented by its CEO, Rebekah Mortensen (Mr. Mortensen's wife), argued against the refusal, making of record a copy of Opposer's website

---

[84] 66 TTABVUE 59-60 (Applicant's Second Notice of Reliance, Exhibit B).

"showing description of products."[85] A copy of the website printout provided by Opposer with its response is reproduced below:



The explanation under the caption "What is ToGo" states that "ToGo allows you to order your from [sic] your favorite restaurants and get the food delivered directly to you. Using your smart phone you can easily choose from available restaurants, order and watch your food be delivered in real-time (available in the USA only)". The TOGO application was abandoned on March 1, 2017.[86]

---

[85] *Id.* at 247.

[86] *Id.* at 60-22.

Applicant introduced this purported earlier version of the RestaurantNews.com press release via the testimony of Troy Brackett, "the founder, owner and publisher of RestaurantNews.com" and "a duly authorized custodian of records of RestaurantNews.com with authority to certify the authenticity of the documents [he] produced."[87] Mr. Brackett testified that the purported earlier version of the press release produced by Applicant is a true and correct copy of the article posted on his website RestaurantNewsRelease.com "on or around November 30, 2015," and he directed Applicant's counsel to the Internet Archive (archive.org) where that document could be found online.[88] He stated further that "it appears a version of that press release is no longer available on the Internet Archive."[89]

Mr. Brackett also produced copies of all of his emails between Mr. Mortensen and himself regarding the press release.[90] According to those emails, which are excerpted below, Mr. Mortensen contacted Mr. Brackett on November 7, 2016 to find out if he could have his original press release updated:[91]

---

[87] 62 TTABVUE 4-5 (Brackett Decl., ¶¶ 2, 7).

[88] 62 TTABVUE 4-6 (Brackett Decl., ¶¶ 2, 6, 9-10), 68-70 (Exhibit D).

[89] *Id.* at 6 (¶ 10).

[90] *Id.* at 5 (¶ 6), 19-67 (Exhibit C).

[91] *Id.* at 42-43.

Delivered-To: troy@restaurantnews.com
Envelope-to: troy@restaurantnews.com
To: "RestaurantNews.com" <troy@restaurantnews.com>
Subject: [RestaurantNews.com Contact] ToGO App correction
X-PHP-Script: www.restaurantnews.com/index.php for 99.43.4.32
From: Aaron Mortensen <a.mortensen@rapidtnc.com>
X-Originating-IP: 99.43.4.32
X-Mailer: WP Clean-Contact (www.restaurantnews.com)
Date: Mon, 07 Nov 2016 00:10:26 -0500

Hi,

Last Nov you posted a press release for us. By any chance would you be able to update the press release as it is using the wrong app name.

I can send you all the replacement text so you can just copy and paste.

Thanks,

Aaron

At 11:30 PM 11/7/2016, you wrote:
Hi Troy,

Are you able to update a press release that we had you list about our software?

Thanks,

Aaron Mortensen
Hungr (formally ToGo)
A RAPID brand

Mr. Brackett responded back, telling him "[t]hat would really be a new release as everything would need to be changed (the content, logo, image, title and URL)."[92]

The next email shows that Mr. Mortensen referred back to Mr. Brackett on July 27, 2017, approximately two weeks before Opposer filed its notice of opposition in this case, clarifying his previous request:

---

[92] *Id.* at 43.

Delivered-To: troy@restaurantnews.com
Envelope-to: troy@restaurantnews.com
From: "Aaron Mortensen" <a.mortensen@rapidtnc.com>
To: "'Troy Brackett'" <troy@restaurantnews.com>
Subject: RE: Press Release update
Date: Thu, 27 Jul 2017 10:40:23 -0700
X-Mailer: Microsoft Outlook 16.0
Thread-Index: AQJAaJeOxTG/S70sMuA+vMur2V6KnAED2g67oYUMjFA=

Hi Troy,

Actually I am hoping a press release that is on the site already can just get fixed with the correct info. You will see the text is almost similar but has the correct app name

I am attaching 2 files, the logo image (200x200px) and the masthead image (500x375)

Also here is the updated text

San Diego, CA (RestaurantNews.com) RAPID Inc. announces the launch of the HUNGR – Mobile Ordering and Delivery app. HUNGR makes it possible for customers to order from their favorite restaurants and have their food delivered directly to them with no limitation on distance. HUNGR uses the vast network of RAPID on-demand drivers to ensure quality and fast delivery times.

Restaurant operators will enjoy the convenience when orders are automatically sent to the restaurant and paid for, thus reducing the man power needed to offer mobile ordering and delivery. Both single unit and multiunit restaurants can use hungr. Each restaurant location can receive orders independently while still providing overall reporting of all locations.

*"The new HUNGR app expands our platform to offer more convenience to our users in the work place or home. We have made it simple for restaurants to receive orders without needing extra manpower which helps increase sales and overall reach to customers who may otherwise not have purchased."*
*Vince DeNatalie, Branding Manager*

The Delivery drivers come from the RAPID on-demand platform and are background checked and reviewed with each trip to ensure that the highest level of service is provided. Each delivery driver uses insulated food carriers to help keep food at the best temperature possible.

Restaurants pay a small monthly fee of just $30 to be connected to HUNGR and then a small percentage from the food orders received. 24/7 support will be available to both users and restaurants. By using HUNGR restaurants increase their sales and reach a larger customer base.

Restaurants that want to sign-up and take advantage of the discounts being offered currently can do so at:
http://rapidtnc.com/hungr

HUNGR will be available for both iOS and Android devices.

RAPID Inc. is an on-demand technology platform based in sunny San Diego, California. Offering unique features and no-surge pricing make using RAPID the preferred choice.

If you would like more information about HUNGR or the RAPID platform, please contact Aaron Mortensen at

[93]

---

[93] *Id.* at 33-34 (highlighting added).

With his reply to that email, Mr. Brackett offered to do "a redirect to the new release[.] That way anytime someone clicks on the old one, they'll be automatically sent to the new one."[94] He also asked Mr. Mortensen if he wanted to change the title to "RAPID Launches HUNGR Mobile Ordering and Delivery App[.]"[95] Noting that he had just received another email from Mr. Mortensen, Mr. Brackett asked for clarification: "So you just want it updated and don't want it to go in tomorrow's newsletter?"[96] Mr. Mortensen declined Mr. Brackett's suggestion, emphasizing that "**[t]he biggest thing is having the original date of November 30th, 2015 stay in tact** [sic]."

Delivered-To: troy@restaurantnews.com
Envelope-to: troy@restaurantnews.com
From: "Aaron Mortensen" <a.mortensen@rapidtnc.com>
To: "'Troy Brackett'" <troy@restaurantnews.com>
Subject: RE: Press Release update
Date: Thu, 27 Jul 2017 11:05:42 -0700
X-Mailer: Microsoft Outlook 16.0
Thread-Index: AQJAaJeOxTG/S70sMuA+vMur2V6KnAED2g67ANIN/LgBZU3vCKFzH5Cw

Correct we don't need it in tomorrow's newsletter. Just the web version updated. The biggest thing is having the original date of November 30th, 2015 stay in tact.

So I figured just updating the original will be good.

[97]

However, on cross-examination, which took place after Mr. Brackett's testimony was made of record, Mr. Mortensen testified that he did not know who wrote or provided the text for the content of the RestaurantNews.com article, and he denied

---

[94] *Id.* at 39.

[95] *Id.*

[96] *Id.*

[97] *Id.* at 27 (highlighting added).

ever contacting the website himself for any reason, except one time, three months prior to his deposition on February 3, 2021, to ask the company about its advertising rates:[98]

> Q: Have you or anyone affiliated with Rapid, Inc., ever contacted RestaurantNews.com for any reason?
> A: Yes.
> Q: On how many occasions?
> A: Once I believe.
> Q: And when was that?
> A: Three months ago.
> Q: And who contacted RestaurantNews.com?
> A: I did.
> Q: And for what purpose?
> A: To ask them for advertising rates.
> Q: Did you discuss anything else other than advertising rates?
> A: No.
> Q: And is that the only time you ever contacted RestaurantNews.com?
> A: As far as I knew, yes.
> Q: Are you aware that articles at RestaurantNews.com can be edited after they have been initially published?
> A: I don't know.

Mr. Mortensen also denied ever contacting the Wayback Machine to have the article/press release removed:[99]

> Q: … Have you personally ever contacted the WayBack Machine or anyone affiliated with the WayBack Machine for any reason?
> A: No.

However, Applicant called Chris Butler, the Office Manager at the Internet Archive – which provides "a service known as the Wayback Machine" that "makes it possible to browse more than 450 billion pages stored in the Internet Archive's web

---

[98] 59 TTABVUE 249-50 (Mortensen Cross Dep., pp. 72:22-73:13).

[99] *Id.* at 211 (34:9-24).

archive"[100] – to show that Mr. Mortensen did indeed contact the Internet Archive's Wayback Machine for the specific purpose of changing the archived version of Opposer's press release in the RestaurantNews.com article discussed above. Mr. Butler provided a document consisting of several email communications between Mr. Mortensen and the Internet Archive that he testified are business records.[101] In the first email shown below and dated August 22, 2017, which is 13 days after Opposer filed its notice of opposition in this proceeding, someone with the email "a.mortensen@rapidtnc.com" (which is one of Opposer's emails of record in the '189 Application),[102] attempted to have the "2015 index" removed from the original article:[103]

**Subject:** Index removal
**From:** a.mortensen@rapidtnc.com
**Date:** 8/22/17, 4:37 PM
**To:** info@archive.org

Can you please remove the 2015 index of
http://www.restaurantnews.com/rapid-launches-togo-mobile-delivery/

The Internet Archive Team's response to this email explained that they could remove pages from the Internet Archive's Wayback machine, but to do so, they required certain information, including verification that the person requesting removal was "the site owner or author" of the content that the requestor "wish[ed] to

---

[100] 61 TTABVUE 4 (Butler Decl., ¶¶ 2, 4); 83 TTABVUE 18 (Applicant's Brief).

[101] *Id.* at 7-19 (Exhibit A).

[102] June 14, 2016 Application, TSDR at p. 3.

[103] 61 TTABVUE 6 (Butler Decl., ¶ 10 (Exhibit A).

have excluded."[104] The email also requested clarification as to whether the requestor was specifically concerned about "only specific files or directories," in which case they could "leave the rest of the archives available."[105]

In the next email, which is dated August 25, 2017 and signed by "Aaron Mortensen," the sender clarified that he was only requesting removal of the specific pages showing the RestaurantNews.com article:[106]

Hello,

The only index being requested to be removed is the two "captures" in 2015 of the page located at:

http://www.restaurantnews.com/rapid-launches-togo-mobile-delivery/

The wayback machine index 2 times Dec 3, 2015 and Dec 12, 2015 yet never indexed again and thus continues to show incorrect links and info.

As the content author of this page we ("RAPID INC") are asking for the removal/and or update of indexes of said index from 2015. You will notice the wayback machine captured incorrect info on the page. By going to the page that is publicly on the web it has our licensed images correctly displayed as well as the correct links to the proper website.

!!!!!!!!!!!!!!!!!!!!!!!!

If you are able to update the index image so it correctly captures the page as it has been written since Nov 30, 2015 that is ok and leave the index date intact so that way we are helping to improve the wayback machine content overall that is fine as well. That is up to you. If the original capture(s) can't be fixed then removing the 2015 indexes is requested.

!!!!!!!!!!!!!!!!!!!!!!!!

For reference:

**You will notice on the page I am the author and contact person listed.**

**Aaron Mortensen**
**a.mortensen@rapidtnc.com**

---

[104] *Id.*

[105] *Id.*

[106] *Id.*

Applicant, in its brief, correctly notes that "nowhere in Opposer's 35-page brief do the words 'press release' or 'RestaurantNews.com' appear."[107] Opposer, however, shrugged off this evidence in its reply brief, asserting that it has no expectation that the Board will consider this evidence because Opposer does not rely on it:

> Applicant is attempting to hang nearly all of its response related to prior use on a single website article that Opposer has not even cited or relied upon its opening brief in an attempt to attack the credibility of Mr. Mortensen. Opposer has not asked the Board to consider the restaurantnews.com article in its Opening Brief and therefore has no expectation that the Board will consider it as evidence related to prior use.[108]

Opposer's expectation is misplaced because we consider all relevant evidence, regardless of whether only one party relies on it in its briefs.

### 6. Credit Card Statements

As part of his testimony, Mr. Mortensen provided what he states "comprises a representative collection of card processing statements showing sales generated by meal orders placed through the use of the HUNGR online and the HUNGR mobile app for the months of June 2014, December 2014, January 2015, June 2015, December 2015, May 2016, and June 2016" and are "addressed to RapidHUNGR or HUNGR TO GO FOOD only for administrative convenience in the billing and invoicing process."[109] Excerpts from the June 2014 and May 2016 statements[110] are reproduced below:

---

[107] 83 TTABVUE 22 (Applicant's Brief).

[108] 84 TTABVUE 15 (Opposer's Reply Brief).

[109] 24 TTABVUE 9-10 (Mortensen Decl., ¶ 16), 39-46 (Exhibit 8).

[110] *Id*. at 40, 46 (Exhibit 8).





Applicant argues that "[e]ven if this evidence is accepted at face value, this evidence does not establish that there was any trademark use of the alleged HUNGR mark. The addressees on such records are provided by the account holder and do not

reflect anything more than that. It is an enormous leap to view such records and conclude, as Opposer does, that this evidence proves that 'the mark HUNGE [sic] was always used in connection with the website.'"[111]

### 7. Multiple Domains

With his declaration, Mr. Mortensen provided March 25, 2019 screenshots of (1) Opposer's websites, including (1) myhungr.com/en, which "introduce[s] new customers to [Opposer's] HUNGR brand delivery services"; (2) hungrdrivers.com/en/restaurants, which is "directed to soliciting restaurants to sign up for [Opposer's] HUNGR delivery program"; and (3) hungr.com, which is "directed to soliciting restaurants to sign up for [Opposer's] HUNGR delivery program."[112] Based on Mr. Mortensen's testimony and these screenshots, Opposer argues that:

> Since 2012, Opposer has used multiple domain names in connection with the website software, some of which include the HUNGR mark within the text of the URL address itself and some of which do not, before eventually launching the <myhungr.com> website. Opposer previously used the name "myhungr.com" because "hungr.com" was unavailable. Opposer purchased the domain name <hungr.com>, which Opposer now uses. However, as stated above the HUNGR mark has

---

[111] 83 TTABVUE 25 (Applicant's Brief). As shown in the examples, all of the credit card statements referenced by Mr. Mortensen above contain redacted portions. Trademark Rule 2.126(c) "To be handled as confidential, submissions to the [] Board that are confidential in whole or part … must be submitted using the 'Confidential' selection available in ESTTA [the Electronic System for Trademark Trials and Appeals] or, where appropriate, under a separate paper cover. Both the submission and its cover must be marked confidential and must identify the case number and the parties. A copy of the submission for public viewing with the confidential portions redacted must be submitted concurrently." 37 C.F.R. § 2.126(c). Although Opposer submitted certain documents provided by Mr. Mortensen under seal, *see* 24 TTABVUE, it did not do so with respect to the documents comprised by Exhibit 8. Accordingly, Opposer is ordered to submit a fully unredacted copy of the documents submitted with Exhibit 8 to Mr. Mortensen's testimony within 30 days of this decision, failing which Exhibit 8 will not be considered as part of the record.

[112] 24 TTABVUE 13 (Mortensen Decl., ¶¶ 27-29).

continuously appeared on the Opposer's website page, regardless of the domain name or software version, since 2012.[113]

Applicant asserts that "Opposer conveniently, if not misleadingly, lumps these domains together as evidence of continuous use of its alleged HUNGR mark," points out, as corroborated by WHOIS database printouts provided with Mr. Grass' testimony,[114] that the domain myhungr.com was not registered until May 17, 2016, and the domain hungrdrivers.com was not registered until September 11, 2016.[115] Applicant also highlights Mr. Mortensen testimony that the domain hungr.com, which Applicant now uses, was only "recently purchased."[116]

### B. Opposer's Third Party Witnesses

Opposer called four third-party witnesses to corroborate the testimony of Mr. Mortensen, including (1) Ahed Ihmud, an independent contractor delivery driver; (2) David Lucchetti, an independent contractor delivery driver; (3) Fardad Raouf, a restaurant owner; and (4) Rosalie Delaney, a purported customer of Opposer.[117]

### 1. Ahed Ihmud

Mr. Ihmud testified that he has been "making pick-ups from restaurants and deliveries to HUNGR customers since November 20, 2013," and that "[f]rom the beginning, [he] used the RAPID platform to receive orders for HUNGR deliveries, via

---

[113] 82 TTABVUE 27 (Opposer's Brief) (citations omitted).

[114] 60 TTABVUE 5-6 (Grass Decl., ¶¶ 11, 14) 20-26 (Exhibit D), 43-46 (Exhibit G).

[115] 83 TTABVUE 25-26 (Applicant's Brief).

[116] 83 TTABVUE 26 (Applicant's Brief); 24 TTABVUE 13 (Mortensen Decl., ¶ 28).

[117] 22 TTABVUE 4 (Ihmud Decl., ¶ 2), 8 (Lucchetti Decl., ¶ 2), 13 (Raque Decl., ¶ 2), 19 (Delaney Decl., ¶¶ 3-4).

SMS text message or later using the RAPID app."[118] He further testified that he has "always identified [him]self to restaurants and customers as a HUNGR driver."[119]

On cross-examination by Applicant's counsel, when asked whether he came up with the November 20, 2013 date himself, Mr. Ihmud testified that the date was provided to him in the declaration that he signed, and that he had not reviewed any background documents in connection with the declaration when he received it, but he believed it was around that date.[120]

### 2. David Lucchetti

Mr. Lucchetti provided testimony similar to that of Mr. Ihmud in his declaration, except that he purportedly started "making pick-ups from restaurants and deliveries to HUNGR customers" on "April 4, 2015."[121]

On cross-examination, like Mr. Ihmud, Mr. Lucchetti testified that he only knows the "Rapid platform" as the Rapid App, and that the specific date he indicated in his declaration as the start date of his deliveries for Opposer was provided by whoever prepared the declaration.[122] Asked if he could confirm the precise date of April 4, 2015 that he said he started delivering orders to HUNGR customers for Opposer, he stated, "I can't confirm it for certain, but I can't deny it either," but he did confirm that his

---

[118] *Id.* at 4 (Ihmud Decl., ¶¶ 2-3)

[119] *Id.* (¶ 4).

[120] 59 TTABVUE 23 (23:4-24:16).

[121] 22 TTABVUE 8 (Lucchetti Decl., ¶¶ 2-4).

[122] 59 TTABVUE 149-51 (Lucchetti Cross Dep., 15:18-16:3).

"only basis for stating that is because it was provided to [him] by Mr. Mortensen."[123] He also testified that he did not make any deliveries for Opposer during the years 2014 and 2016-2018, but he did make deliveries for Opposer in October 2019 when he was in California for a couple of weeks, although he did not know how many deliveries he made at that time.[124] Asked why he did not make any deliveries in 2014, he said "again, the time of the declaration is when it's established that I started making deliveries, so I don't know about [Opposer] in 2014."[125] He stated that found out about Opposer through Mr. Mortensen in 2015, who presented the driver opportunity.[126] He further stated that at the time of his declaration, he had known Mr. Mortensen for 20 years, considered him a good friend, and that Mr. Mortensen was one of his 19 contacts on Facebook.[127]

### 3. Fardad Raouf

Mr. Raouf testified that his restaurant, Paradiso Mediterranean Cuisine ("Paradiso"), "has been listed on the HUNGR mobile app since February 3, 2016, and has been continuously listed on the HUNGR app since that date."[128] He also provided a picture of his restaurant that shows a HUNGR sign in the window, which he said has been displayed there since February 2016.[129]

---

[123] *Id*. at 150 (16:4-19).

[124] *Id*. at 157 (157:11-23).

[125] *Id*. at 157-58 (157:24-158:14).

[126] *Id*. at 158 (158:15-20).

[127] *Id*. 148-49 (148:2-149:8).

[128] 22 TTABVUE 13 (Raouf Decl., ¶¶ 2-3).

[129] *Id*. (¶ 4), and 16 (Exhibit).

When Mr. Raouf was first presented with a copy of his declaration during cross-examination, he said that he recognized it, but thought it was a contract.[130] Once he understood that it was his declaration, he was asked if he read the sworn statement paragraph above his signature; he indicated that he had not, and did not recall if he understood the meaning of the paragraph at the time of his testimony.[131] He further testified on cross-examination that Opposer prepared the declaration, and that Mr. Mortensen brought it to him personally to sign.[132] He stated that he did not review any documents in connection with his declaration prior to signing it, nor had he reviewed any since that time.[133] He also did not know who took the pictures of his restaurant that were attached to the declaration that he signed, or when they were taken; in fact, he had never seen them until he was cross-examined by Applicant's counsel.[134] Mr. Raouf agreed that he signed the declaration "notwithstanding the fact of what's in the document…."[135]

### 4. Rosalie Delaney

Rosalie Delaney, a resident of San Diego, California, testified that she "found the HUNGR app at the Apple Store on March 29, 2016 and downloaded it to [her] smartphone," created an account, and then placed an order for delivery in the amount

---

[130] 59 TTABVUE 60 (Raouf Cross Dep., 60:2-22).

[131] *Id*. at 61 (61:12-24).

[132] *Id*. at 63-64 (63:11-64:5).

[133] *Id*. at 64 (64:12-17).

[134] *Id*. at 73 (73:10-14).

[135] *Id*. at 62 (62:6-8).

of $49.22 from Mr. Raouf's restaurant.[136]

On cross-examination, Ms. Delaney denied being friends with Mr. Mortensen, but admitted she is "friends" with Mr. Mortensen and his wife on Facebook, and that Mr. Mortensen "liked" (by clicking the "like" button) her name, professional capacity, and the insurance company she previously worked for, on Facebook, further to Ms. Delaney's request that he do so.[137] She also testified that she sold Mr. Mortensen and his wife, as well as Opposer, an insurance policy.[138] She further testified that she knows Ahed Ihmud because Mr. Mortensen referred him to her "for an insurance code."[139]

Ms. Delaney also knows who Fardad Raouf is because she met him "maybe five times" when she ate at his restaurant, Paradiso, the restaurant she purportedly ordered from on March 29, 2016 using Opposer's HUNGR app (which was downloaded to her phone the same day).[140] When asked how she came up with the date of March 29, 2016, she said, "Aaron [Mortensen] provided me with his -- the information, and I have no reason to believe that it was not accurate." She further confirmed that "the information in [her] declaration is based purely on whatever information Mr. Mortensen provided [her]...."[141] Mr. Mortensen delivered her order

---

[136] 22 TTABVUE 19 (Delaney Decl., ¶¶ 1, 3-4).

[137] 59 TTABVUE 106-07, 109-10 (Delaney Cross Dep., 15:8-19:12).

[138] *Id*. at 110-11 (19:4-20:23).

[139] *Id*. at 110 (19:15-18).

[140] *Id*. at 107-18, 113 (16:22-17:10, 22:15-19).

[141] *Id*. at 113-14 (22:21-23:4).

personally.[142]

All four of Opposer's third-party witnesses were represented by Opposer's counsel, Mr. Lorenzo, during their cross-examination testimony.[143] During their examination, Applicant's counsel attempted to determine if they were paying their own legal fees or if someone else, such as Opposer, was paying their legal fees, whereupon Opposer's counsel instructed Mr. Mortensen and the witnesses not to answer, claiming attorney-client privilege.[144]

### C. Discussion

Based on the foregoing, Applicant contends that Opposer has:

> resorted to intentionally doctoring evidence and sanitizing the internet to cover up its alteration of this evidence; falsely denying in filings with the Board that it had not committed these acts; intentionally misrepresenting evidence as establishing historical facts; and drafting false declarations for Opposer's friends, who, on cross examination, were almost entirely unaware of the contents of the declarations. Opposer did all this in a concerted effort to deceive Applicant and the Board into believing that it was using its alleged HUNGR mark in connection with a mobile app years before it actually had begun any purported use of that term.[145]

After carefully reviewing all evidence and testimony in this case, including the evidence and testimony highlighted above, we find that not only has Opposer's "star

---

[142] *Id.* at 116 (25:16-20).

[143] 59 TTABVUE 13 (Ihmud Cross Dep., 13:4-25), 57-59 (Raouf Cross Dep., 57-13-59:2), 99-100 (Delaney Cross Dep., 99:6-100:6); 140-41 (Lucchetti Cross Dep., 140:20-141:13).

[144] *Id.*; 59 TTABVUE 190-91 (Mortensen Cross Dep., 190:8-191:2). "Generally, the identity of an attorney's client and the nature of the fee arrangement between an attorney and his client are not privileged." *In re Grand Jury Subpoenas*, 803 F.2d 493, 496 (9th Cir. 1986) (citations omitted).

[145] 83 TTABVUE 7-8 (Applicant's Brief).

witness" Mr. Mortensen been dishonest with the Board, but he also engaged in spoliation of evidence. "Spoliation refers to 'the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Optimal Chem. Inc. v. Srills LLC*, 2019 USPQ2d 338409, at \*16 (TTAB 2019) (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)).

Mr. Mortensen's testimony and evidence regarding the November 30, 2015 press release on RestaurantNews.com is particularly egregious, and casts a dark shadow over the remaining testimony and evidence he provided. We make the following specific findings of fact with respect to that evidence:

● Opposer's November 30, 2015 press release on RestaurantNews.com announced the launch of Opposer's "ToGo – Mobile Ordering and Delivery app,"[146] not an "updated HUNGR – Mobile Ordering and Delivery app" as claimed by Mr. Mortensen and shown in the altered version he presented during his testimony.[147]

● On June 14, 2016, approximately seven months after its TOGO application was abandoned, Opposer filed an application to register the mark HUNGR discussed

---

[146] 62 TTABVUE 68-70, 247 (Brackett Decl., Exhibit D); 66 TTABVUE 59-60, 247 (Applicant's Second Notice of Reliance). *See* the (i) the "original" press release uncovered by Applicant and (ii) the page from Opposer's togo.com website Opposer submitted in support of Opposer's now abandoned TOGO application, filed the same month, for "Software for **ordering** and coordinating transportation services in the nature of deliveries, namely, software for the automated scheduling and dispatch of motorized vehicles for the delivery of goods from a restaurant or store." Mr. Mortensen's assertion, in his supplemental declaration provided in support of Opposer's motion for summary judgment earlier in the proceeding, that "ToGo was a completely different app from the HUNGR apps" and was simply "an app for restaurants … to coordinate the dispatch and schedule of drivers for delivery of a food order," is simply not credible. 10 TTABVUE 7 (¶ 19).

[147] 24 TTABVUE 8 (Mortensen Decl., ¶¶ 13-14), 32-39 (Exhibits 5-6).

above.[148] However, the examining attorney assigned to that application suspended it based on a potential likelihood of confusion with Applicant's prior pending intent-to-use application for the mark HUNGRY that was filed on May 4, 2016.[149] On November 7, 2016, less than three months later, Mr. Mortensen contacted RestaurantNews.com and was successful in his efforts to change the content of the press release from "the launch of the ToGo – Mobile Ordering and Delivery app" to "the launch of the updated HUNGR app."[150] We infer that Mr. Mortensen did this in order to create the appearance of a priority date that preceded the filing date of Applicant's HUNGRY application. Mr. Mortensen made sure to emphasize that that **"[t]he biggest thing is having the original date of November 30th, 2015 stay in tact [sic]."[151]** Despite taking such steps, Mr. Mortensen denied that he ever contacted RestaurantNews.com except one time to inquire about advertising rates.[152]

- On August 22, 2017, approximately two weeks after filing the notice of opposition in this case, Opposer tried to scrub the existence of the original article from the web by contacting the Internet Archive, and was successful.[153] Despite taking such steps, Mr. Mortensen denied ever contacting the Internet Archive to have webpages pertaining to his company removed from the Internet.[154]

---

[148] 66 TTABVUE 50-57 (Applicant's Second Notice of Reliance).

[149] 21 TTABVUE 10-60 (Opposer's Notice of Reliance, Exhibit 2).

[150] 62 TTABVUE 19-67 (Brackett Decl., Exhibit C).

[151] *Id.* at 27.

[152] 59 TTABVUE 249-50 (Mortensen Cross Dep., pp. 72:22-73:13).

[153] 61 TTABVUE 7-10 (Butler Decl., Exhibit A).

[154] 59 TTABVUE 21 (Mortensen Cross Dep., pp 34:20-24).

"These types of actions engaged in by a party are not only prohibited, but tarnish and undermine the integrity of the Board and its proceedings. [Opposer's] fabrication of evidence and untruthful testimony has tainted its entire case and has called into serious question the reliability of any remaining evidence or testimony submitted by Opposer…." *Optimal Chem. Inc. v. Srills LLC*, 2019 USPQ2d 338409, at *18. The "legal maxim 'falsus in uno, falsus in omnibus' (false in one thing, false in everything) appears appropriate under these circumstances." *See Lambert v. Blackwell*, 387 F.3d 210, 256 (3rd Cir. 2004) (describing the falsus in uno, falsus in omnibus principle, which permits a jury to disregard part or all of a witness's testimony if the witness has testified falsely about a material fact); *United States v. Martinez*, 356 F. Supp. 2d 856, 870 (M.D. Tenn. 2005) (applying the doctrine falsus in uno, falsus in omnibus to discredit an agent's entire testimony due to certain inconsistencies with the record).

We thus look askance on Mr. Mortensen's remaining testimony, including but not limited to his claim that a screenshot he provided, purportedly from 2012, was from the first HUNGR website in 2012;[155] his claim that Opposer distributed a promotional flyer, showing a 2014 iPhone, in 2012;[156] his claim that the Google Play and Apple app stores show downloads of Opposer's HUNGR app from 2015, notwithstanding an owner's ability to change the name of the app and icon shown without updating the app;[157] and his claim that the credit card statements he provided reflect "sales

---

[155] 24 TTABVUE 5-7 (Mortensen Decl., ¶¶ 2, 6-7).

[156] 24 TTABVUE 7, 18 (Mortensen Decl., ¶ 6 and Exhibit 1).

[157] *Id*. at 8 (¶ 11), 24-31 (Exhibits 3-4); 67 TTABVUE 4-5 (Taylor Decl., ¶¶ 1, 3, 6-7).

generated by meal orders placed through the use of the HUNGR online and the HUNGR mobile app for the months of June 2014, December 2014, January 2015, June 2015, December 2015, May 2016, and June 2016."[158]

We also find that Opposer's witnesses, Ahed Ihmud, David Lucchetti, Fardad Raouf, and Rosalie Delaney, while perhaps intending to testify truthfully about the dates on which they purportedly first used or became familiar with Opposer's HUNGR app, merely signed the declarations based on the advice of or their relationship with Mr. Mortensen without having any independent recollection of the specific dates to which they testified. As examples, we point to Mr. Raouf's testimony that he signed his declaration "notwithstanding the fact of what's in the document….,"and Ms. Delaney's testimony that "the information in [her] declaration is based purely on whatever information Mr. Mortensen provided [her]…."[159]

### D. Conclusion

Based on the foregoing, we find that Mr. Mortensen engaged in a pattern of fabrication and spoliation of evidence, which vitiates the probative effect of his testimony and evidence, and taints the remainder of evidence that might otherwise indirectly support Opposer's claim of priority. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-156 (4th Cir. 1995) ("Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence."); *Gilmer v. Colo. Inst. of Art*, 12 F. A'ppx 892, 895, 2001 WL 686406 at *3 (10th Cir.

---

[158] 24 TTABVUE 9-10, 40, 46 (Mortensen Decl., ¶ 16, Exhibit 8).

[159] 59 TTABVUE 62 (Raouf Cross Dep., p. 62:6-8), 116 (Delaney Cross Dep., 25:16-20).

2001) (court has the discretion to decide factual disputes regarding the fabrication of evidence even when that issue also goes to the merits of the case). In short, we do not find that Opposer has met its burden of proving priority by a preponderance of the evidence. "Because opposer cannot establish its priority, a necessary element of the ground of likelihood of confusion, opposer's priority and likelihood of confusion claim is dismissed." *Threshold TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1039 (TTAB 2010).

   ***Decision***: The opposition is dismissed.